Filed 10/30/20  P. v. Douglas CA4/1
NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>PATRICK C. DOUGLAS,<br><br>  Defendant and Appellant. | D076038<br><br><br>(Super. Ct. No. SCE375859) |


APPEAL from a judgment of the Superior Court of San Diego County, Herbert J. Exarhos, Judge.  Affirmed.

Mary Woodward Wells, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Patrick C. Douglas of two counts of premeditated attempted murder (Pen. Code,[1] §§ 187, subd. (a), 664, 189; counts 1 and 3); two counts of assault with a deadly weapon (§ 245, subd. (a)(1); counts 2 and 4); assault with a deadly weapon on a peace officer (§ 245, subd. (c); count 5); and evading an officer with reckless driving (Veh. Code, § 2800.2, subd. (a); count 6). The jury also found true allegations that during the commission of counts 1 through 4, Douglas personally used a deadly or dangerous weapon (a knife) (§§ 12022, subd. (b)(1), 1192.7, subd. (c)(23)), and personally inflicted great bodily injury (§§ 12022.7, subd. (a), 1192.7, subd. (c)(8)), and that in the commission of count 5, he personally used a deadly and dangerous weapon (a vehicle) (§ 12022, subd. (b)(1)).

The trial court found true allegations that Douglas suffered two prior serious felony convictions (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)) and three prior strike convictions (§§ 667, subds. (b)-(i), 1170.12, 668).

The court sentenced Douglas to prison for a determinate term of 30 years four months and an indeterminate term of life (with parole eligibility after 14 years) plus 25 years to life. The sentence consists of 25 years to life plus nine years for count 3, a life term (with parole eligibility after 14 years) plus nine years for count 1, 11 years for count 5, plus one year four months for count 6. The court stayed Douglas's sentence for counts 2 and 4.

Douglas appeals, contending substantial evidence does not support his conviction under count 5 and the trial court prejudicially erred in instructing the jury that an automobile is an inherently deadly weapon. We affirm.

FACTUAL BACKGROUND

During the early morning of November 7, 2017, Shantey P. was on a bench outside a church on El Cajon Boulevard and 54th Street in San Diego

---

[1] Statutory references are to the Penal Code unless otherwise specified.

when Douglas pulled up in a Mercedes Benz and offered her a ride. Shantey got into Douglas's car and agreed to go to a "room" with him. Although he began by driving normally, Douglas started to drive erratically when he began traveling on the 94 freeway. Shantey asked Douglas to pull the car over several times, but he refused. Despite not having a gun, she told him that she was going to shoot him if he did not let her out of the car.

At 2:48 a.m., Douglas pulled into a parking lot, got out of his car, and walked toward an ATM. He then walked to the trunk of his car and said words to the effect, "I am going to kill this bitch." He also asked Shantey something like, "Why are you treating me like this? It is my birthday."

Douglas came around to the passenger side of the car and began hitting and stabbing Shantey several times. Surveillance video from a nearby business showed Douglas making 12 to 17 punching and lunging motions into the front passenger side window.

David F., who was walking in the area at the time, watched as Douglas opened the passenger's side door, threw a purse out of the car, yelled at Shantey to get "the F" out of the car, called her a "bitch," and started "whaling" on her. David ran toward the car screaming, "Hey, what are you doing?" Douglas ran to the driver's side of his vehicle, got in, drove over Shantey's purse, and headed in the direction of the 7-Eleven on Avocado Boulevard.[2]

---

[2]    At trial, David testified that Douglas was not the person he saw attacking Shantey. Nevertheless, the prosecutor impeached David on the stand by offering evidence that he was on methamphetamine on the subject morning and was in custody at the time of trial. The prosecution offered evidence implying that David did not want to appear to be a snitch while incarcerated. However, David testified that he was not afraid of identifying someone for fear of being labeled a snitch.

Shantey, who had managed to get out of the car, started stumbling away. After David picked up her belongings, he noticed she had been stabbed. David grabbed a charging wire from her purse and wrapped it around her leg to stop the bleeding. He then summoned help.

Shortly after 2:57 a.m., an El Cajon police officer arrived at the scene, where he found Shantey lying in the fetal position with a large amount of blood on her. She said that the person who stabbed her was named Patrick, and he was driving a four-door Mercedes. Shantey was taken to the hospital where she was treated for multiple stab wounds as well as fractures to the bones in her face.

While at the scene, the officer heard a report on the radio of a stabbing at the 7-Eleven on Avocado Boulevard, about 3.7 miles away. The description of the vehicle in that broadcast was similar to the description of the vehicle fleeing the scene in Shantey's case.

Around 3:00 a.m., Frito-Lays delivery driver Dina H. was walking out of the 7-Eleven on Avocado Boulevard after making a delivery when Douglas approached and started attacking her. When a San Diego sheriff's deputy responded to the scene, she found Dina on the ground covered in blood. Dina had labored breathing, was turning blue, and was not responding to the deputy's questions. The deputy called the paramedics. Dina was transported to the hospital, where she was treated for a stab wounds.

The surveillance video from the 7-Eleven showed a sedan driving into the parking lot at 3:03 a.m. It made an abrupt stop and then the front driver's side door opened up. Someone in dark pants and a light-colored long sleeve shirt walked and then ran across the parking lot toward Dina's Frito-Lays truck. The actual attack occurred outside the range of the cameras. Dina ran to the front door of the 7-Eleven and said something to the store

4

clerk, which was later determined to be, "I got stabbed." The person in the parking lot walked toward where the sedan was parked and drove away.

As San Diego County Sheriff's Deputy Nic Gowanlock was driving toward the 7-Eleven on Avocado Boulevard in response to a call reporting the stabbing, he observed a light-colored Mercedes driving in the opposite direction on Avocado Boulevard. With his lights and siren activated, Gowanlock made a U-turn, got behind the Mercedes, and broadcast his location over the radio.

Instead of pulling over, Douglas continued driving slowly and then turned west onto Don Pico Road. Gowanlock got on his loud speaker and ordered Douglas to stop his vehicle. Douglas ignored the command and turned left onto Don Pico Court. Once Douglas got to the end of the cul-de-sac, he drove into a driveway, backed out, and began driving back toward Gowanlock and the four or five other patrol vehicles that had joined the pursuit.

San Diego County Sheriff's Deputy Nicholas Hvizdzak, who was in one of those patrol vehicles, activated his overhead camera,[3] holstered his gun, and got out of his car. He then stood in Douglas's pathway, pointed his gun at the Mercedes, and ordered Douglas to get out of the car. Douglas kept driving toward Hvizdzak at about five or ten miles per hour and got within a foot of the deputy's shins.

Hvizdzak moved out of the way of Douglas's car to avoid being hit. However, Hvizdzak kicked under the passenger's side headlight of Douglas's car as it drove by. Hvizdzak believed that it was Douglas's intent to run him over and had he not moved, he would have been hit by Douglas's car.

---

[3] A portion of the recording from Hvizdzak's camera was played for the jury.

Douglas then led deputies on a high-speed pursuit, reaching speeds over 100 mph. He committed several traffic violations during the chase. Eventually, deputies lost sight of Douglas near Steele Canyon and the 94 freeway. Later, they spotted his abandoned Mercedes stopped in the middle of a lane on the 94 freeway.

Douglas's bloody fingerprints were found on the rear of the Mercedes, just below the license plate holder. His blood was also found on the steering wheel. Shantey's blood was found on the passenger's side of the vehicle. Douglas's iPhone and driver's license were also found inside the Mercedes. His license showed that the date of the attack was his birthday, as he told Shantey.

With the help of the Border Patrol using an infrared scope and a helicopter, Douglas was located hiding under a tree. There was blood on Douglas's sleeve when he was taken into custody. Douglas identified himself as Patrick. He had a cut on his hand.

Douglas recorded a video on his phone at 3:04 a.m., about 10 minutes after he stabbed Shantey and two to three minutes before he stabbed Dina. The video showed Douglas holding a knife while driving the Mercedes. It also showed blood inside the vehicle on the passenger's seat and floorboard. In the video, Douglas stated, "I'm about to go on killing spree. I'm going to kill everyone I can kill. You'll never see me again."

Several threatening text messages showing Douglas's anger at an unrelated individual also were sent from his cell phone between 10:51 p.m. and 11:12 p.m. the night before the stabbings.

DISCUSSION

I

SUBSTANTIAL EVIDENCE

A.  Douglas's Contentions

Douglas contends substantial evidence does not support his conviction for assault with a deadly weapon against a peace officer (count 5). Specifically, he argues there was insufficient evidence that he used his car in a manner likely to produce death or great bodily injury.

B.  Standard of Review

We review a sufficiency of the evidence claim under the familiar and deferential substantial evidence standard of review.  (See *People v. Hicks* (1982) 128 Cal.App.3d 423, 429.)  Substantial evidence is evidence that is "reasonable, credible, and of solid value."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)  In reviewing for substantial evidence, we presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  (See *People v. Lee* (2011) 51 Cal.4th 620, 632.) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence."  (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

"When a jury's verdict is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, which will support it, and when two or more inferences can reasonably be deduced from the facts, a

reviewing court is without power to substitute its deductions for those of the jury. It is of no consequence that the jury believing other evidence, or drawing different inferences, might have reached a contrary conclusion." (*People v. Brown* (1984) 150 Cal.App.3d 968, 970.) Whether the evidence presented at trial is direct or circumstantial, the relevant inquiry on appeal remains whether any reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. (See *People v. Manibusan* (2013) 58 Cal.4th 40, 92; *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. (See *People v. Dominguez* (2010) 180 Cal.App.4th 1351, 1356.)

## C. Analysis

"An assault is an unlawful attempt, coupled with present ability, to commit a violent injury on the person of another." (§ 240.) Section 245, subdivision (c) makes it a crime to commit an assault with a deadly weapon on a police officer. The elements of assault with a deadly weapon, as applied to Douglas's use of his car here, are as follows: "1. The defendant did an act with a deadly weapon that by its nature would directly and probably result in the application of force to a person; [¶] 2. The defendant did that act willfully; [¶] 3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [¶] 4. When the defendant acted, he had the present ability to apply force with a deadly weapon to a person; [¶] 5. When the defendant acted, the person assaulted was lawfully performing his duties as a peace officer; [¶] and [¶] 6. When the defendant acted, he knew, or reasonably should have known, that the person

8

assaulted was a peace officer who was performing his duties." (CALCRIM No. 860; see §§ 240, 245, subd. (c).)

Assault is a general intent crime. (*People v. Williams* (2001) 26 Cal.4th 779, 788.) An "assault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur. Rather, assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*Id.* at p. 790.)

Cars can be used as deadly weapons. (*People v. Bipialaka* (2019) 34 Cal.App.5th 455, 458 (*Bipialaka*); *People v. Oehmigen* (2014) 232 Cal.App.4th 1, 10.) The question for the jury below was whether the way Douglas used his car was likely to cause or produce death or great bodily injury. (*Bipialaka*, at p. 459.)

Here, Douglas contends substantial evidence does not support his conviction for assault with deadly weapon (a car) because there was no collision, no injuries, and his focus was on evading apprehension, not striking Hvizdzak. He also claims he "slowly maneuvered . . . past . . . [a] patrol vehicle . . . didn't reve his engine, suddenly grip the wheel or accelerate toward [Hvizdzak]." In support of his position, Douglas relies on several cases wherein he notes the "strong fact patterns" as compared to the relatively weak evidence he claims exists in the instant action. (See, e.g., *Bipialaka, supra,* 34 Cal.App.5th at p. 458 [car driven at another car in an intersection]; *People v. Golde* (2008) 163 Cal.App.4th 101, 116-117 [defendant accelerated vehicle toward victim as she tried to run away]; *People v. Finney* (1980) 110 Cal.App.3d 705, 716 [defendant rammed several well-marked patrol cars while avoiding civilian vehicles during high speed car chase]; *People v. Claborn* (1964) 224 Cal.App.2d 38, 41 [defendant altered course and

9

aimed vehicle at police officer, colliding head-on with him].) Although we acknowledge that the facts in these cases might be more severe than what was presented to the jury in the instant matter, we find a comparison between the facts of this case to the facts of those other cases not particularly helpful in a substantial evidence review. (See *People v. Thomas* (1992) 2 Cal.4th 489, 516 ["When we decide issues of sufficiency of the evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts."].) Accordingly, the cases cited by Douglas provide fact patterns supporting a conviction for assault with a deadly weapon (a car), but they do not provide us with the only fact patterns on which we could find substantial evidence to exist here.

In the instant matter, the evidence adduced at trial supports the jury's finding that Douglas willfully committed an act that, by its nature, would probably and directly result in great bodily injury to Hvizdzak. Douglas drove his car toward Hvizdzak and there is no evidence that he intended to stop. As Hvizdzak testified at trial, with Douglas driving toward him, he had two choices: shoot or move. He moved. He further stated that had he not moved, he would have been hit by Douglas's car. Indeed, he was so close to Douglas's car, he was able to kick under the passenger's side headlight.

Additionally, the fact that Douglas was only traveling five to 10 miles per hour does not undermine the jury's verdict. The evidence at trial showed that, had Hvizdzak not moved out of the way, the car would have hit him. There was no evidence that Douglas intended to stop his car or tried to stop his car, and the jury could reasonably infer that the car would have run over Hvizdzak, causing great bodily injury.

In short, witness testimony along with the video footage of the subject incident is sufficient to support the conviction here. Based on the record, we

10

are satisfied that " ' "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.]' " (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.)

II

JURY INSTRUCTIONS

The court instructed the jury with CALCRIM No. 875, which stated among other things: "A deadly weapon other than a firearm is any object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury." It also gave CALCRIM No. 860, which provided, in part: "A deadly weapon is any object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing or likely to cause great bodily injury." The court also instructed the jury under CALCRIM No. 3145, which included a similar definition of deadly weapon.

Douglas contends the court erred by instructing that a weapon could be either inherently deadly or deadly in the way it is used because a car is not an "inherently deadly" weapon. "We review defendant's claims of instructional error de novo." (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707.)

In *People v. Aledamat* (2019) 8 Cal.5th 1 (*Aledamat*), the defendant used a box cutter by thrusting the blade at another man. (*Id.* at p. 4.) The court instructed the jury with CALCRIM No. 875, which defined a deadly weapon as one that is inherently deadly or used in such a way that it is capable of causing and likely to cause death or great bodily injury. (*Aledamat*, at p. 4.) Our Supreme Court held that "[b]ecause a knife can be, and usually is, used for innocent purposes, it is not among the few objects that are inherently dangerous weapons." (*Id.* at p. 6.) The Supreme Court

11

accordingly held the jury instruction was erroneous but found the error was harmless beyond a reasonable doubt. (*Id*. at pp. 7, 15.)

Likewise, here, a car is not an inherently deadly weapon. (*People v. Montes* (1999) 74 Cal.App.4th 1050, 1054 [noting that a car is not inherently dangerous but can be found to be a deadly weapon].) The court accordingly erred by referring to an inherently deadly weapon in the jury instructions.

We next consider whether the instructional error was prejudicial. The "usual 'beyond a reasonable doubt' standard of review established in *Chapman v. California* (1967) 386 U.S. 18, 24 . . . for federal constitutional error applies. The reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Aledamat*, *supra*, 8 Cal.5th at p. 3; see *id*. at p. 13.)

Here, the record shows the instructional error was harmless beyond a reasonable doubt. At trial, no party argued that simply using a car was "inherently deadly." During closing argument, the prosecutor did not explain the phrase "inherently deadly." Nor did he argue that Douglas's car constituted a deadly weapon as a matter of law. Rather, the prosecutor stated that he was proceeding on a theory that Douglas used his car as a deadly weapon, that is he used it in a manner that could cause death or great bodily injury: "It is a moving vehicle being used as a battering ram to escape law enforcement capture, a deadly weapon. If Deputy Hvizdzak did not get out of the way and allow the defendant to run him over, would you consider that car a deadly weapon."

The prosecutor later focused the jury on the manner in which Douglas drove the car when interacting with Hvizdzak:

> "When you specifically use a car as a battering ram to get through a police blockade, sure you're using it as a deadly weapon. What would have happened to Deputy Hvizdzak if he didn't get out of the way? There's no indication that the defendant was going to stop. Deputy Hvizdzak had two options that day: get out of the way or shoot him. He chose to get out of the way for his own safety."

Moreover, in discussing the lesser included offense to count 5, the prosecutor again told the jury to focus on how Douglas was using his car:

> "So there's a lesser-included count to count 5, also. Simple assault on a peace officer. The way I like to think of this, basically if you don't think a moving car being used as a battering ram to avoid being caught is a deadly weapon or was being used as a deadly weapon in that case, then you move on to the lesser. Because that doesn't include the deadly weapon element. It's just a simple assault. So again, if you find him guilty of the assault with that deadly weapon, the car, count 5, you leave the lesser-included blank."

Like the prosecutor, Douglas's trial counsel did not argue that the car was an inherently deadly weapon. To this end, defense counsel focused on how Douglas was maneuvering the car ("he swerved"), claiming Douglas "moved [the car] out of the way." However, counsel did not argue that Douglas's car could not be a deadly weapon. Again, similar to the prosecutor, defense counsel emphasized how Douglas was driving his car.

As in *Aledamat*, we conclude the jury necessarily found: "(1) defendant did an act with a deadly weapon (either inherently or as used) that by its nature would directly and probably result in the application of force; (2) defendant was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the

13

application of force to someone; and (3) defendant had the present ability to apply force with a deadly weapon to a person." (*Aledamat, supra*, 8 Cal.5th at p. 15.) It is unlikely the jury would have found these above elements without considering how Douglas used his car. The error accordingly was harmless beyond a reasonable doubt.

## DISPOSITION

The judgment is affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:


HALLER, J.


DATO, J.

14